IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| VINITA KING, o/b/o W.G. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:11-CV-1923-SPM |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Michael J. Astrue, the Commissioner of Social Security, denying the application of Plaintiff for Child's Supplemental Social Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 25). For the reasons stated below, the Court affirms the Commissioner's denial of Plaintiff's application.

## I.     PROCEDURAL HISTORY

On August 10, 2007, Plaintiff (then six years old), through his mother, filed an application for SSI. (Tr. 214-17). His application was initially denied. (Tr. 106-11). On August 29, 2008, following a hearing, an administrative law judge (ALJ) found Plaintiff not disabled. (Tr. 81-94). On April 13, 2010, the Appeals Council of the Social Security Administration reversed the ALJ's decision and remanded the case to the ALJ for

1

consideration of new evidence relevant to Plaintiff's intellectual functioning, for further acquisition of evidence related to Plaintiff's mental impairments, and for (if necessary) evidence from a medical expert. (Tr. 97-99). On November 17, 2010, following a supplemental hearing, the ALJ issued another decision finding Plaintiff not disabled. (Tr. 10-19). On October 4, 2011, the Appeals Council denied Plaintiff's request for review. (Tr. 1-4). Thus, the November 2010 decision of the ALJ stands as the final decision of the Commissioner.

In appealing the Commissioner's decision, Plaintiff challenges the ALJ's finding that Plaintiff did not have a "marked" limitation in the ability to attend to and complete tasks.

## II.    GENERAL LEGAL PRINCIPLES

A child under the age of eighteen is considered disabled if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. S 1382c(a)(3)(C)(i). To determine whether a child is disabled, the ALJ employs a three-step process. At the first step, the ALJ determines whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(a), (b). If so, the child is not disabled; if not, the ALJ proceeds to the next step. *Id.* At the second step, the ALJ determines whether the child has a medically determinable impairment that is severe. 20 C.F.R. § 416.924(c). If the child's impairment is not medically determinable or is a slight abnormality that causes minimal limitations, the ALJ will find the child does not have a severe impairment and is not disabled. 20 C.F.R. § 416.924(c). If the impairment is

severe, the ALJ proceeds to the third step. At the third step, the ALJ determines whether the child's impairment meets, medically equals, or functionally equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the child's impairment meets, medically equals, or functionally equals a listed impairment, the child is disabled under the Act. 20 C.F.R. § 416.924. *See also Scott ex rel. Scott v. Astru*e, 529 F.3d 818, 821 (8th Cir. 2004) (describing the three-step process).

In determining whether a child's impairment is functionally equivalent to a listed impairment, the ALJ considers the claimant's functioning in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others), (3) moving about and manipulating objects, (4) caring for oneself, and (5) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). "An impairment is functionally equivalent to a listed impairment when the impairment results in an 'extreme' limitation in one domain of functioning or a 'marked' limitation in two domains of functioning." *England v. Astrue*, 490 F.3d 1017, 1020 (8th Cir. 2007) (citing 20 C.F.R. § 416.926a(a)). "A marked limitation in a domain is a limitation that seriously interferes with a child's ability to 'independently initiate, sustain, or complete activities.'" *Id.* (quoting § 416.926a(c)(2)(i)). A marked limitation is "'more than moderate' but 'less than extreme.'" *Id.* (quoting 20 C.F.R. § 416.926a(e)(2)(i)). An extreme limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(1).

In reviewing a decision to deny benefits, the Court's role is to determine whether the Commissioner's decision is supported by substantial evidence. *Scott*, 529 F.3d at 821; *England*, 490 F.3d at 1019. "'Substantial evidence is less than a preponderance, but

is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" *England*, 490 F.3d at 1019 (quoting *Stormo v. Barnhart*, 377 F.3d 801, 805 (8th Cir. 2004)).  The Court must consider "both evidence that detracts from and evidence that supports the Commissioner's decision."  *Id.* (internal quotation marks omitted).  "If substantial evidence supports the decision, [the Court] will not reverse, even if substantial evidence could have been marshaled in support of a different outcome."  *Id.*

## III.  FACTUAL BACKGROUND

### A.  TESTIMONY OF PLAINTIFF'S MOTHER

Plaintiff was born on February 10, 2001.  (Tr. 214).  He was six years old at the time he applied for benefits, seven years old at the time of the first hearing before the ALJ, and nine years old at the time of the second hearing before the ALJ.  (Tr. 22, 57, 214).

At the first hearing before the ALJ, on July 3, 2008, Plaintiff's mother, Vinita King, testified to the following.  Plaintiff was repeating the first grade because of problems learning to read and write.  (Tr. 60, 64).  He had one-on-one teachers in school to help him, along with an occupational therapist.  (Tr. 61).  He could not remember from one hour to the next what he had been told, and he had trouble following instructions.  (Tr. 64-65).  He did some chores and brushed his teeth, but his mother had to get him dressed and make him take a bath.  (Tr. 68).

At the second hearing before the ALJ, on August 5, 2010, Plaintiff's mother testified to the following.  Plaintiff was going into third grade.  (Tr. 24).  He was in regular school, not special classes, but he received one-on-one help.  (Tr. 38).  In the

previous school year, he had had problems trying to read small words. (Tr. 25). His teachers had told her that he had problems with reading, math, and following directions. (Tr. 26-27). He could not read headlines in a newspaper or tell the difference between a "tomato" and "potato" on a can of soup. (Tr. 27-28). He could add and subtract single-digit numbers a little but could not do multiplication and does not know how many quarters or dimes make up a dollar. (Tr. 28-29). He could write his name but not his phone number, his address, or a whole sentence. (Tr. 29-30). He had trouble explaining things and figuring out which word to use. (Tr. 31).

Plaintiff had friends at school and got along pretty well there. (Tr. 32). He needed help buttoning his shirt, tying his shoes, and getting his pants on correctly. (Tr. 33). He knew to look both ways before he crosses the street, knew not to get in a car with strangers, and knew not to play with fire. (Tr. 35-36). Until shortly before the hearing, he had not been holding a pencil correctly, but he had been working with an occupational therapist once a week, and his handwriting had gotten more legible. (Tr. 34-35).

Plaintiff's mother testified that at home, Plaintiff watched age-appropriate television. He did not express any interest in other activities. (Tr. 36).

### B. MEDICAL, EDUCATIONAL, AND OPINION EVIDENCE[1]

#### 1. SPECIAL SCHOOL DISTRICT EVALUATION – MAY 8, 2007

On May 8, 2007, when Plaintiff was six years old and in kindergarten, Special School District completed a diagnostic report with respect to Plaintiff. (Tr. 249-56). It was noted that the school had significant educational concerns in the areas of cognition

---

[1] The following is not intended to be an exhaustive summary of all of the evidence the Court has reviewed; instead, it focuses on the records most relevant to the issues presented on appeal and those emphasized by the parties.

and language.  It was also noted that "[t]he school did not document significant concerns in the areas of . . . adaptive behavior, task related behaviors, speech, or social-emotional behavior."  Plaintiff's mother reported to the school that the following behaviors were of occasional concern: care for personal needs without reminders, performing chores and running errands, fulfilling responsibilities without reminders, having adequate memory and concentration skills, expressing ideas clearly, admitting when he had done something wrong, responding to discipline, knowing right from wrong, managing money properly, completing homework with minimal help in a reasonable amount of time, showing signs of frustration working on homework, and having fears or problems sleeping or nightmares.  (Tr. 250).  The report indicated that Plaintiff was functioning in the lower third of his class in all areas.  He had specific difficulties understanding concepts, understanding words, using complete sentences, sequencing events when talking, defining words verbally, drawing conclusions, and communicating in social situations. (Tr. 251).

On a Weschler Preschool and Primary Scale of Intelligence test, Plaintiff had a full-scale IQ of 78, placing him in the borderline range and in the seventh percentile.  (Tr. 252, 254).  His weakest area was processing speed, indicating that he has difficulty with tasks that require working memory and reasoning ability.  (Tr. 254).  Plaintiff showed age-appropriate skills in use of grammatical and morphological structures, sentence length and form, and vocabulary.  Concerns included poor topic maintenance and inappropriate and/or excessive responses.  (Tr. 255).

Overall, Plaintiff's scores revealed skills consistent with overall cognitive functioning, with some areas of weakness.  It was noted that his language functioning

may impact his educational performance in identifying labels, attributes, and functions; stating functions and definitions; responding to questions; telling/retelling stories; and turn-taking with peers. (Tr. 255).

Informal observations showed that Plaintiff struggled with alphabet recognition, writing, number recognition, language skills, understanding concepts, understanding words, using complete sentences, and communicating in social situations. However, he had made progress and was trying hard. (Tr. 255).

Plaintiff was found to be ineligible for special education services. (Tr. 256).

### 2. TEACHER QUESTIONNAIRE (FIRST GRADE TEACHER) – NOVEMBER 12, 2007

On November 12, 2007, Plaintiff's first-grade teacher filled out a questionnaire indicating that Plaintiff had very serious problems in all areas of acquiring and using information. (Tr. 265). She also stated that Plaintiff had serious or very serious problems in several areas related to attending and completing tasks, specifically paying attention when spoken to directly, carrying out single- or multi-step instructions, completing class and homework assignments, and completing work without careless mistakes. She stated that he needed much teacher and/or peer assistance, had difficulty following oral directions, and was unable to read written directions. (Tr. 266). She also indicated numerous very serious problems with language use in interactions with others. (Tr. 267).

### 3. EVALUATION OF KYLE DEVORE, PH.D. – NOVEMBER 27, 2007

On November 27, 2007, Kyle DeVore, Ph.D., filled out a Childhood Disability Evaluation Form indicating that Plaintiff had an impairment or combination of impairments that was severe, but did not meet, medically, equal, or functionally equal, the listings. (Tr. 562). He found marked limitations in acquiring and using information,

noting that Plaintiff had borderline IQ scores. He found less than marked limitations in attending and completing tasks, noting that Plaintiff had difficulty following verbal instructions and read very little but was methodical in his approach to problem solving and task completion. He found less than marked limitations in Plaintiff's ability to interact and relate with others and no limitations in moving about and manipulating objects or in Plaintiff's ability to care for himself. (Tr. 564).

### 4. SPECIAL SCHOOL DISTRICT EVALUATION – JANUARY 18, 2008

On January 18, 2008, Special School District completed another diagnostic report. (Tr. 618-31). It was noted that Plaintiff's school had concerns in the areas of cognition and academics (reading, math, and written expression). It was noted that "[t]he school did not document significant concerns in the areas of . . . . adaptive behavior, task related behaviors, speech, or social-emotional behavior." (Tr. 619). Plaintiff's mother reported significant concerns with memory and concentration skills and completing homework within a reasonable time, and occasional concerns with performing chores, fulfilling responsibilities without reminders, and completing homework with minimal help. It was noted that Plaintiff's teacher reported that Plaintiff was functioning in the lower third of his class in all academic areas, that he required continuous intervention to function in the classroom setting, that the curriculum and instruction were modified to meet his individual needs, and that Plaintiff was unable to retain information on an hour-to-hour or day-to-day basis. It was noted that interventions attempted included Oasis tutors in kindergarten and first grade, occupational therapy twice a week for one hour, one-on-one work with a teacher for 45 minutes daily, peer models, small group and one-on-one

reading with reading specialists, computer assisted technology for letter/word identification, and modification of academics to his skill level. (Tr. 620).

On the Kaufman Assessment Battery for Children – Second edition (KABC-II), Plaintiff's score was in the below average range of cognitive ability (a score of 77, sixth percentile). (Tr. 623). On a Kaufman Test of Educational Achievement, Second Edition (KTEA-II), his overall academic skills were in the below average range (seventh percentile). (Tr. 624). Multiple individuals indicated that Plaintiff tried very hard and was eager to learn. (Tr. 624-25). Plaintiff was found ineligible for special education services. (Tr. 627).

### 5. CARE TEAM REPORT – MARCH 31, 2008

On March 31, 2008, a Care Team report noted that Plaintiff had made steady but slow progress in kindergarten, with many interventions in place. (Tr. 390). It was noted that Plaintiff was "on task, attentive and asks for help when needed" in the classroom, that he was polite and followed school norms, and that he always tried his best. However, it was noted that he was experiencing difficulty in most areas of the first-grade curriculum; that he struggled to understand and use language concepts; that he does not use or understand age appropriate vocabulary; that he has difficulty understanding directions; and that he was often delayed in his ability to answer a question. The teacher noted that Plaintiff often looked confused or lost when directions were given, and that was also true in the physical education setting. The teacher noted considerable concern in the area of reading, noting that Plaintiff did not know how to write letters independently, confused letters and numbers, did not know what sounds letters make, and struggled with math concepts such as counting and identifying numbers. In an update, it

was noted that Plaintiff was making very slow progress and was able to identify most letters but did not have phonemic awareness. It was noted that during the day, he spent part of the time in a kindergarten class and part of the day working with individuals on reading and basic math. He started the day with his first grade class but then attended a kindergarten class for part of the day. (Tr. 391). The team recommended that Plaintiff possibly be retained for a second first-grade year. Interventions at that point included attending a kindergarten for part of the morning, one-on-one work with his teacher, one-on-one work with a teaching assistant, one-on-one work with a reading assistant, an Oasis tutor in kindergarten, peer modeling, directions given a variety of ways, small group reading with reading specialists, occupational therapy outside of school, additional one-on-one work with fine motor and letter identification, computer-assisted technology being used for letter and word identifications, and a referral to Special School District for an academic evaluation. (Tr. 392).

### 6. *TESTIMONY OF LICENSED PSYCHOLOGIST KAREN PERRY – JULY 3, 2008*

On July 3, 2008, Licensed Psychologist Karen Perry testified as a medical expert at the first hearing before the ALJ. (Tr. 69-76, 130). She had reviewed Plaintiff's medical evidence but had not examined him. (Tr. 70). She rated Plaintiff as having marked limitations in acquiring and using information, less than marked limitations in attending and completing tasks, less than marked limitations in interacting and relating with others, no limitations in moving and manipulating objects, no limitations with regard to care for self, and no limitations with regard to physical well-being. (Tr. 71, 74, 91). On examination by Plaintiff's attorney, she testified that she had considered the teacher questionnaire indicating that Plaintiff required one-on-one assistance and stated that it

indicated that he needs more assistance than other kids his age; however, she testified that she considered the other evidence in the record as well, including the Care Team report describing one of Plaintiff's strengths as the fact that he was on task and asked for help when needed. (Tr. 72-75). She also testified that consideration of the interventions described in the Care Team report did not change any of her answers to any of the domains. (Tr. 74).

### 7. TEACHER QUESTIONNAIRE (SECOND GRADE TEACHER) – UNDATED[2]

An undated questionnaire was completed by Plaintiff's second-grade teacher, Kimberly Howard. (Tr. 494-501). She indicated that Plaintiff was functioning a grade level below normal. (Tr. 494). In the area of acquiring and using information, the teacher indicated very serious problems in reading and comprehending written material and recalling and applying previously learned material, and serious problems in understanding vocabulary, comprehending and doing math problems, providing organized oral explanations and adequate descriptions, expressing ideas in written form, and applying problem-solving in class discussions. She stated that Plaintiff struggled to complete written assignments without assistance from the teacher and that even with extra support for his reading skills, he had difficulty retaining instructional strategies. (Tr. 495).

Ms. Howard found that Plaintiff had no limitations in attending and completing tasks, interacting with others, caring for himself, or physical well-being. (Tr. 496-500).

---

[2] It is unclear when this report was completed. However, it appears to have been printed on January 21, 2010, so it must have been completed on or before that date. (Tr. 493-501).

### 8. EVALUATION OF ROBERT COTTONE, PH.D. – FEBRUARY 10, 2010

On February 10, 2010, Robert Cottone, Ph.D., filled out a Childhood Disability Evaluation form for Plaintiff. (Tr. 658). He found less than marked limitations in acquiring and using information and no limitations in attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for yourself, and health and physical well-being. (Tr. 660). He found that Plaintiff's impairments were severe but did not meet or equal a listing. (Tr. 658). His report indicates that he considered Plaintiff's prior testing results, the Special School District evaluation from January 2008, one teacher questionnaire, and reports from Plaintiff's mother. (Tr. 663).

### 9. TEACHER QUESTIONNAIRE (SECOND GRADE TEACHER) – JUNE 4, 2010

On June 4, 2010, Kimberly Howard completed another questionnaire. (Tr. 513-18). It was noted that Plaintiff is in a regular classroom and received services from reading specialists for three hours a week and services from math specialists for three hours a week, in addition to services from three volunteer tutors (an Oasis tutor, a community member, and a grandparent). (Tr. 512). Plaintiff's teacher identified several serious problems related to acquiring and using information. (Tr. 513). With respect to attending and completing tasks, she indicated that Plaintiff had serious or very serious problems in maintaining pace, completing tasks on time, working independently, and carrying out detailed instructions. She noted that Plaintiff has difficulty understanding and retaining information. (Tr. 517).

## 10. CONSULTATIVE EXAMINATION OF PAUL REXROAT, PH.D. – JULY 27, 2010

On July 27, 2010, Paul Rexroat, Ph.D., examined Plaintiff and completed a psychological evaluation report. (Tr. 686-97). Dr. Rexroat noted that Plaintiff's speech was easily understood, that his fine and gross motor skills were age-appropriate, that rapport was easily established, and that Plaintiff had good social skills and excellent verbal skills. Dr. Rexroat stated that Plaintiff exhibited good understanding of directions, had a good attitude toward testing, had a methodical and orderly approach to test items, put forth a lot of effort, "exhibited good ability to attend to and concentrate on tasks," and recognized errors and reacted realistically. (Tr. 686). He administered a Weschler Intelligence Scale for Children – 4 and found a full-scale IQ of 76, which is in the borderline range of intelligence and placed Plaintiff in the fifth percentile. (Tr. 687). Dr. Rexroat diagnosed borderline intelligence. (Tr. 693). Dr. Rexroat completed a Medical Source Statement indicating that Plaintiff had a good or very good ability to interact with others, follow directions, and communicate. He stated that Plaintiff had a fair ability to use judgment; maintain attention/concentration; and maintain concentration, persistence, or pace. He also found good social skills and very good motor skills. (Tr. 696). On the form he filled out, "fair" was defined as "ability to function in this area is seriously limited, but not precluded." (Tr. 695). Dr. Rexroat assigned Plaintiff a Global Assessment of Functioning (GAF) Score of 55.[3] (Tr. 694).

---

[33] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic

### 11. TESTIMONY OF PSYCHOLOGIST JAMES LANE, PH.D. – AUGUST 5, 2010

On August 5, 2010, James Lane, Ph.D., a psychologist, testified as a medical expert before the ALJ. (Tr. 40-53). He had reviewed Plaintiff's medical evidence but had not examined him. (Tr. 43). He opined that Plaintiff's learning disability was severe but did not meet or equal the criteria of a listed impairment. (Tr. 46-47). He found that Plaintiff had a marked impairment in acquiring and using information, basing that assessment on Plaintiff's borderline IQ scores, achievement scores, and teacher reports. (Tr. 47). He rated Plaintiff as less than marked in attending and completing tasks, in attention and concentration, and in interacting with others. (Tr. 47-48). Dr. Lane found no limitations on moving and manipulating objects, ability to care for oneself, or physical health and well-being. (Tr. 48). Dr. Lane indicated that he had considered the interventions Plaintiff had received. (Tr. 49-50). On examination by Plaintiff's attorney, he indicated that if he had reviewed the November 2007 teacher questionnaire or the June 2010 teacher questionnaire in isolation, he would have found marked limitations in the areas of attention and concentration. (Tr. 51-53). However, he stated that what stood out throughout the record as a whole were problems with words, reading, and writing, whereas concentration was "not as heard about." He stated that if he were to view a person as markedly impaired, the impairment would be a phenomenon that stood out throughout the record. (Tr. 51).

---

attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

### 12. INTERROGATORY RESPONSE OF JAMES LANE, PH.D. – SEPTEMBER 30, 2010

On September 30, 2010, Dr. Lane returned an interrogatory response indicating that he had reviewed additional school and medical records from 2007 through 2010. (Tr. 719-20). He changed his diagnosis to borderline intellectual functioning, severe. However, his conclusion that Plaintiff's impairments did not meet or equal a listing was unchanged. He noted that Plaintiff had marked limitations in acquiring and using information but less than marked limitations in attending and completing tasks and in health and physical well being, and no limitations in other areas. (Tr. 719).

### 13. SPECIAL SCHOOL DISTRICT EVALUATION – FEBRUARY 23, 2011

On February 23, 2011, Special School District completed an evaluation report with respect to Plaintiff. (Tr. 546-60). The school had requested an evaluation because of significant educational concerns in the areas of cognition, reading, math, written expression, and social-emotional behaviors. It was noted that Plaintiff was reading at a first grade level and that there had been little progress despite ongoing, intense reading intervention. (Tr. 547). Plaintiff's composite IQ score of 84 placed him in the fourteenth percentile. With respect to his cognitive assessment, it was noted that he "attended to tasks and materials appropriately for his chronological age," "required little to no encouragement to perform the variety of tasks," and "demonstrated adequate endurance to complete all tasks as presented." (Tr. 549). With respect to his behavior assessment, it was noted that Plaintiff's teachers reported at-risk to clinically significant concerns in the area of attention problems (the tendency to be easily distracted or unable to concentrate more than momentarily) and that Plaintiff's mother reported at-risk concerns in terms of

Plaintiff's distractibility and ability to concentrate. (Tr. 552). The assessment revealed a specific learning disability that indicated the need for special education. (Tr. 555).

## IV.     DECISION OF THE ALJ

On November 17, 2010, the ALJ issued a written decision. (Tr. 13-19). He found that Plaintiff had not engaged in substantial gainful activity since birth. He found that Plaintiff had the following medically established impairments: borderline intellectual functioning with reading and general learning disorders. He found that Plaintiff had a marked, but not extreme, limitation in acquiring and using information. He found that Plaintiff had less than marked limitations in attending to and completing tasks and health and physical well-being. He found no medically established limitations in any other domains of functioning. He found that Plaintiff had no medical impairment that met or medically equaled the criteria of any listed impairment. He found that Plaintiff had no medically determinable physical or mental impairment, or combination of impairments, that resulted in marked and severe functional limitations. He concluded that Plaintiff had not been under a disability as defined in the Act at any time through the date of his decision. (Tr. 18). Thus, he found Plaintiff ineligible for SSI. (Tr. 19).

## V.     DISCUSSION

In appealing the ALJ's decision, Plaintiff argues that the ALJ's finding that Plaintiff did not have a "marked" limitation in the "attending to and completing tasks" domain was not supported by substantial evidence.

"When considering the attending and completing tasks domain, the inquiry focuses on how well the child is able to focus and maintain his or her attention and how well the child begins, carries through, and finishes activities." *England v. Astrue,* 490

16

F.3d 1017, 1022 (8th Cir. 2007) (citing 20 C.F.R. § 416.926a(h)).  A school-age child should be able to focus his or her attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments; to concentrate on details and not make careless mistakes beyond what would be expected in other children of the same age; to be able to change activities or routines without becoming distracted or distracting others; to stay on task and in place when appropriate; to be able to sustain attention well enough to participate in group sports, read alone, and complete family chores; and to be able to complete a transition task (such as getting ready for a school bus or changing classrooms) without extra reminders and accommodation.  20 C.F.R. § 926a(h)(2)(iv).

Plaintiff first argues that the ALJ's analysis was not consistent with Social Security Ruling 09-01p (SSR 09-01p).  According to SSR 09-01p, the ALJ is to take a "whole child" approach in determining the child's limitations in each domain.  Plaintiff specifically notes that SSR 09-1p requires the ALJ to consider the help a child needs in order to function.  The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independent the child is in functioning, and the more severe the limitation.  SSR 09-1p.  Plaintiff emphasizes that he required extensive help to function in the classroom, noting that his teachers indicated that he needed significant one-on-one help and that he had a reading specialist and a math specialist, three volunteer tutors from Oasis, a community member, and a grandparent who came to the class to help him.

The Court first notes that the ALJ specifically discussed the "whole child" approach in his decision and cited SSR 09-1p, indicating that he used it as a framework

for his decisionmaking. In addition, in his decision (and in his earlier decision, which he incorporated by reference into the second decision), the ALJ discussed the medical and other evidence related to Plaintiff's abilities, including evidence related to his ability to attend to and complete tasks and his need for help in the classroom. (Tr. 16-18, 89-90). The ALJ specifically discussed Plaintiff's mother's testimony regarding the individualized help Plaintiff received at school; the statement of Plaintiff's second grade teacher that Plaintiff struggled to complete assignments without assistance and that he had difficulty retaining material despite extra support; and the fact that Plaintiff received special interventions for reading and math from three different volunteer tutors. (Tr. 16-17). The ALJ noted, however, that Plaintiff was still in regular classes and was getting "special" instruction only about six hours a week as of June 2010. (Tr. 17, 512). He also considered the other evidence in the record, including the opinion of medical expert James Lane, who found that although Plaintiff had a marked impairment in acquiring and using information, he had less than marked limitations in his ability to attend and concentrate. (Tr. 17, 47). The ALJ also considered the fact that Dr. Lane's opinion was consistent with the opinion of Dr. Perry, who had opined at the first hearing before the ALJ that Plaintiff had less than marked limitations in attending to and completing tasks. (Tr. 17, 71).

In support of his argument that he had marked limitations in the ability to attend to and complete tasks, Plaintiff notes that medical expert Dr. Lane testified that if the questionnaire completed by Plaintiff's teacher second grade teacher on June 4, 2010 (Tr. 512-18) or the questionnaire completed by Plaintiff's teacher on November 12, 2007 (Tr. 264-71) were viewed in isolation, they would indicate that Plaintiff's ability to attend and

concentrate were markedly impaired. (Pl's. Br. at 20-21, Tr. 51-53). However, what a record would indicate if viewed in isolation is of little relevance to the disability inquiry. The disability determination requires consideration of "all relevant evidence," not consideration of specific pieces of evidence in isolation. *See* 20 C.F.R. § 416.924(a). Dr. Lane specifically noted that a marked impairment would stand out throughout the record. (Tr. 51). After reviewing the record as a whole, including but not limited to the teacher questionnaires cited by Plaintiff, Dr. Lane found less than marked impairments in ability to attend and concentrate. (Tr. 44-48). Importantly, Dr. Lane had considered the evidence showing the interventions and assistance Plaintiff received. (Tr. 49-50).

The ALJ's conclusion is also supported by a questionnaire completed by Plaintiff's second grade teacher in which the teacher stated that Plaintiff had no limitations in attending to and completing tasks. (Tr. 496). In addition, in a March 2008 Care Team report, one of Plaintiff's listed strengths was that he was on task and attentive. (Tr. 391).

The ALJ's decision is supported by several statements in Special School District evaluations. Evaluations from 2007 and 2008 stated that although Plaintiff's school had significant educational concerns in the areas of cognition and language, "[t]he school did not document significant concerns in the areas of . . . adaptive behavior, task related behaviors, speech, or social-emotional behavior." (Tr. 250, 619). Furthermore, an evaluation from February 2011 noted that in a cognitive assessment, Plaintiff "attended to tasks and materials appropriately for his chronological age," "required little to no encouragement to perform the variety of tasks," and "demonstrated adequate endurance to complete all tasks as presented." (Tr. 549).

The ALJ's conclusion is further supported by the opinions of the other experts who evaluated the evidence, none of whom found that Plaintiff had marked limitations in the attending and completing tasks domain. Dr. Devore found that Plaintiff's limitations in attending and completing tasks were less than marked (Tr. 564), as did Dr. Cottone (Tr. 660).

Plaintiff also argues that Dr. Rexroat's MSS indicating that Plaintiff had a "fair" (defined on the form as "seriously limited, but not precluded") ability to use judgment; maintain concentration/attention; and maintain concentration, persistence or pace, demonstrates a marked level of impairment. However, in his psychological evaluation, Dr. Rexroat also stated that Plaintiff "exhibited good ability to attend to and concentrate on tasks," that he "exhibited good understanding of directions," and that "his general approach to test items was methodical and orderly." (Tr. 686). In addition, as the ALJ noted, Dr. Rexroat found Plaintiff to have a GAF score of 55, which indicates moderate, not marked, difficulty with social and school functioning. (Tr. 17, 694). Viewed as a whole, Dr. Rexroat's findings do not significantly undermine the ALJ's conclusion that Plaintiff had a less than marked limitation in attending to and completing tasks. (Tr. 686, 694).

Plaintiff also suggests that because Dr. Rexroat's report notes concentration problems and a need for extra help at school, his analysis is "synonymous" with the requirements of SSR 09-4p (describing how to evaluate a child's limitations in the domain of attending and completing tasks). *See* Pl's. Br. at 22. SSR 09-4p notes that in the domain of attending and completing tasks, the ALJ considers how well a child is able to focus and maintain attention; how well the child begins, carries through, and finishes

activities or tasks; and the child's level of alertness and ability to focus on an activity or task despite distractions and to perform tasks at an appropriate pace. SSR 09-04p. SSR 09-04p also indicates some examples of limitations in this domain, including the need for extra supervision to stay on task and the inability to plan, manage time, or organize self in order to complete assignments or chores. *Id.* However, SSR 09-4p expressly states that these examples "do not necessarily describe a 'marked' or an 'extreme' limitation." *Id.* To determine whether Plaintiff's limitations were "marked," the ALJ properly considered the record as a whole, which (as discussed above) contained substantial evidence that Plaintiff had less than marked limitations in the ability to concentrate and attend to tasks. In addition, Dr. Rexroat found that Plaintiff exhibited "good ability to attend to and concentrate on tasks," a finding that is certainly not "synonymous" with a finding of marked limitations in ability to concentrate or attend to tasks.

Finally, Plaintiff points to several pieces of evidence in the record supporting his assertion that he has limitations in concentration and attending to tasks, including several statements in his teachers' questionnaires, statements in a Care Team report, and statements in Special School District evaluations. *See* Pl's Br. at 23-34. The Court has reviewed this evidence and acknowledges that it provides some support for Plaintiff's argument that he has a marked ability to concentrate and attend to tasks. However, the Court finds that when the record is viewed as a whole, substantial evidence in the record as a whole supports the ALJ's decision. The Court further finds that the ALJ's decision in consistent with the relevant Social Security Rulings and other legal requirements. The Court may not reverse the decision of the ALJ merely because substantial evidence might have supported a different conclusion. *See Buckner v. Astrue*, 646 F.3d 549, 556 (8th

Cir. 2011) ("We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact.").

## VI.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED ADJUDGED AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

<u>/s/Shirley Padmore Mensah</u>
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this <u>1st</u> day of <u>March</u>, 2013.